Filed 7/14/22  P. v. Avila CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE ALBERTO AVILA,<br><br>    Defendant and Appellant. | B312626<br><br>(Los Angeles County<br>Super. Ct. No. VA102440) |

        APPEAL from an order of the Superior Court of Los Angeles County, Lee W. Tsao, Judge.  Affirmed.
        Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.
        Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Kathy S. Pomerantz, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

Jose Avila appeals from the superior court's order denying his petition for resentencing under Penal Code section 1170.95.[1] He contends that the court applied the wrong standard of proof at the evidentiary hearing and that substantial evidence did not support the court's finding Jose aided and abetted the murder of Manuel Pasqual. We affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

A. *A Jury Convicts Jose of Murder and Assault with a Deadly Weapon; We Modify the Judgment and Affirm*

On September 1, 2007 Jose Avila drove to South Gate to drop off his younger brother, Jonathan Avila, at a party. As they approached their destination, Jose yelled out, "'Compton Varrio Tortilla Flats, and this is our neighborhood.'" Jose stopped the car in the middle of the street near a group of six teenagers, Jonathan Sedano, Fernando Gutierrez, Fernando Hernandez, Miguel Lorenzana, Hernan Partida, and Manuel Pasqual, who were gathered around Pasqual's car. Jonathan got out of the car and asked, "'Where's the party at?'" When Sedano responded, "Who are you," Jonathan punched him. Jonathan and Sedano began to fight, and Gutierrez and Partida joined Sedano in hitting Jonathan, while Jose watched the fight from inside his car. During the fight Jonathan took out a curved knife with a five- to six-inch blade, swung it at Sedano, and stabbed him in the stomach. After he stabbed Sedano, Jonathan walked toward

---

[1]     Statutory references are to the Penal Code.

Hernandez while holding the knife, and Hernandez backed away. Jonathan turned around, approached some of the other teenagers, and swung the knife at them.

Jose got out of the car, lifted his shirt to reveal his gang tattoos, and shouted his gang name. Jose approached Gutierrez and Hernandez, Hernandez kicked Jose in the face, and they began to fight. Cesar Cabrera, who had been standing on the street corner, approached the group and told Jose he should leave the teenagers alone. Jose yelled "get the heat" or "bring my heat," and Jonathan broke free and ran toward Jose's car. On his way to the car, Jonathan encountered Cabrera and stabbed him in the neck. Jonathan reached into the passenger side door, but Pasqual pushed Jonathan away from the car and closed the door. Jonathan and Pasqual struggled, and Jonathan stabbed Pasqual three times in the abdomen. Partida held Jonathan in a "bear hug" and grabbed Jonathan's wrist. Jonathan said "I'm sorry" several times. When Pasqual staggered toward his car and fell to the ground, Partida let Jonathan go and ran toward Pasqual.

Jose and Jonathan ran to the car and got inside. The teenagers surrounded the car and hit Jose and Jonathan as they sat in the car. Hernandez hit Jonathan, who stabbed Hernandez in the right arm. Cabrera grabbed the gear shift on the steering column and tried to prevent Jose from driving away. When Jonathan tried to stab Cabrera's hand, Cabrera let go of the gear shift.

Once Jose was able to get the car in gear, he drove forward and almost hit Hernandez. Jose then put the car in reverse and crashed into a fence. Sedano and a witness, Andy Reyes, moved out of the way to avoid being hit. Jose drove forward, and Partida moved Pasqual, who was on the ground near the door of

3

Pasqual's car, out of the way. Jose's car collided with Pasqual's car before Jose drove away. Pasqual died as a result of multiple stab wounds.

A jury convicted Jose on one count of first degree murder (§ 187, subd. (a)) and two counts of assault with a deadly weapon (a car and a knife) (§ 245, subd. (a)(1)). The jury found true an allegation that Jose personally used a deadly or dangerous weapon (the car) and allegations that he committed the crimes for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members. (§§ 186.22, subd. (b)(4), 12022, subd. (b)(1).) The court found true allegations Jose had served five prior prison terms. The court struck three of the prior prison term enhancements and imposed two of them. (§§ 667.5 subd. (b).) The court sentenced Jose to a prison term of 25 years to life on his murder conviction, plus two years for the prior prison term enhancements. The court also imposed consecutive determinate terms on the two convictions for assault with a deadly weapon.

Jose appealed, arguing among other things that substantial evidence did not support his convictions and that the court committed instructional errors. We held that, although substantial evidence supported Jose's convictions, the trial court erred in instructing the jury with CALJIC No. 3.02 because "the instruction did not tell the jury it could convict [Jose] of second degree murder if it had a reasonable doubt first degree murder was the natural and probable consequence of assault with a deadly weapon." Therefore, we reversed the finding Jose acted with premeditation and deliberation in the murder of Pasqual and directed the trial court to give the People an opportunity to

4

retry Jose on the premeditation and deliberation element of first degree murder. (*People v. Avila* (Feb. 8, 2011, B219748) [nonpub. opn.].)

The Supreme Court subsequently decided *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), which held an aider and abettor may not be convicted of first degree murder under the natural and probable consequences doctrine. Following our directions on remand and the Supreme Court's decision in *Chiu*, the trial court reduced Jose's first degree murder conviction to second degree murder and resentenced him to a prison term of 17 years to life.

B.     *The Superior Court Denies Jose's Petition Under Section 1170.95*

In January 2019 Jose filed a petition for resentencing under section 1170.95. Jose alleged that the People proceeded against him under a theory of felony murder or murder under the natural and probable consequences doctrine, that he was convicted of first or second degree murder under one of those theories, and that he could not now be convicted of first or second degree murder because of changes to sections 188 and 189. The court appointed counsel to represent Jose. After briefing, the People conceded Jose made a prima facie case for relief because "the People had argued natural and probable consequence theory at trial." The superior court issued an order to show cause.

In May 2021 the superior court held an evidentiary hearing. The court stated it had reviewed the files, including the briefs on the petition, relevant portions of the trial testimony, and this court's decision in Jose's direct appeal. After summarizing the facts of the case, the court stated it intended to deny the petition because "the evidence establishes an intent to kill by both Jonathan and Jose, making him guilty for murder

5

under the current law." Counsel for Jose argued that Jose did not intend to kill; that Jose yelled his gang name and called out to Jonathan to get the gun to scare the teenagers and to allow Jonathan to escape to the safety of the car; and that, if there had been a gun in the car, Jose or Jonathan would have used it. Counsel for Jose also argued that there was no evidence Jose took any action to aid and abet the murder of Pasqual and that the prosecution's theory at trial—that Jose aided and abetted the murder by serving as a distraction—was not persuasive. The People argued that Jose aided and abetted Pasqual's murder when he "amp[ed] things up" by announcing his gang affiliation and that Jose's statement to Jonathan to "get my gun" showed "a coordinated and supportive effort" toward his brother's actions.

The court found the People had met their burden of proving Jose was ineligible for relief under section 1170.95. The court stated: "[G]iven all of the evidence here and the circumstances of the offense, I'm not inclined to find that [Jonathan] ran to the car simply to escape when he—when Jonathan has very clearly, in my view, evidenced an intent to kill, and Jose, by virtue of his actions, including . . . telling Jonathan to get the heat, has aided and abetted those actions." The court also stated: "In the midst of [Jonathan fighting and stabbing the victims], we have Jose getting out of the car, announcing his gang affiliation, showing his tattoos in an effort to intimidate the others. . . . In addition to telling Jonathan to get a gun, which potentially would escalate the level of violence, in driving away, several of the witnesses testified that he, Jose, tried to run them over, and that's another fact that's mentioned by the Court of Appeal that supports an intent to kill."

6

The court ruled: "I am not bound by the jury's findings. I make my own independent decision here . . . and that is that Jonathan and Jose both had the intent to kill. . . . I find that the People have met their burden of proving each and every element beyond a reasonable doubt and that Jose Avila could still be convicted and, in fact, is guilty of murder under the current law."

The court denied the petition. Jose timely appealed.

## DISCUSSION

A.    *Senate Bill No. 1437 and the Section 1170.95 Petition Procedure*

Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015, § 4) "substantially modified the law relating to accomplice liability for murder, eliminating the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder [citation] and significantly narrowing the felony-murder exception to the malice requirement for murder." (*People v. Mancilla* (2021) 67 Cal.App.5th 854, 862 (*Mancilla*); see §§ 188, subd. (a)(3), 189, subd. (e).) To eliminate liability for murder under the natural and probable consequences doctrine, the Legislature added section 188, subdivision (a)(3), which provides: "Except [for felony-murder liability] as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (See *People v. Gentile* (2020) 10 Cal.5th 830, 842-843 (*Gentile*); *People v. Lopez* (2022) 78 Cal.App.5th 1, 11; *Mancilla*, *supra*, 67 Cal.App.5th at p. 862.) Senate Bill No. 1437 also added section 1170.95, which allows "an individual convicted of felony

7

murder or murder based on the natural and probable consequences doctrine to petition the sentencing court to vacate the conviction and be resentenced on any remaining counts if he or she could not have been convicted of murder because of Senate Bill 1437's changes to the definition of the crime." (*Mancilla, supra*, 67 Cal.App.5th at p. 862; see *Gentile, supra*, 10 Cal.5th at p. 843.)

As the Supreme Court clarified in *People v. Lewis* (2021) 11 Cal.5th 952, and as amendments by Senate Bill No. 775 made explicit, if a section 1170.95 petition contains all the required information, the court must appoint counsel to represent the petitioner if requested. (*Id.* at pp. 962-963; see § 1170.95, subds. (b)(1)(A), (b)(3).) The prosecutor must then file a response to the petition, to which the petitioner may file a reply, and after which the court must hold a hearing to determine whether the petitioner has made a prima facie showing he or she is entitled to relief. (§ 1170.95, subd. (c).)

If the petitioner makes a prima facie showing under section 1170.95, subdivision (c), the court must issue an order to show cause and hold an evidentiary hearing to determine whether to vacate the murder conviction and resentence the petitioner on any remaining counts. (§ 1170.95, subd. (d)(1).) At this hearing the prosecutor has the burden of proving, "beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (d)(3).) The prosecutor and petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens. (See *Gentile, supra*, 10 Cal.5th at pp. 853-854.)

On appeal from an order denying a petition under section 1170.95, we "review the trial court's fact finding for substantial evidence." (*People v. Ramirez* (2021) 71 Cal.App.5th 970, 985.) We "'"examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt."' [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298 (*Clements*).)[2]

_____

[2] Jose contends that, rather than reviewing for substantial evidence, we should review the evidence independently because the superior court judge who ruled on the section 1170.95 petition was not the judge who heard the testimony at trial, did not make any credibility determinations, and relied on a "cold record." Jose relies on *People v. Vivar* (2021) 11 Cal.5th 510, which held an appellate court should independently review an order denying a motion under section 1473.7 to withdraw a plea based on adverse immigration consequences. (*Id.* at p. 524.) The Supreme Court stated that the issues raised by a motion under section 1473.7, "while mixed questions, are predominantly questions of law." (*Ibid.*) Jose's petition under section 1170.95, however, raises predominantly questions of fact, and we defer to the superior court's resolution of those questions. (See *Clements, supra,* 75 Cal.App.5th at p. 301 [the factors justifying independent review in *Vivar* "don't support applying independent review in

B.    *The Superior Court Applied the Correct Standard of Proof*

Section 1170.95 requires "the trial court, acting as an independent fact finder, to determine beyond a reasonable doubt whether [a] defendant is guilty of murder under a valid theory of murder." (*People v. Garrison* (2021) 73 Cal.App.5th 735, 745; see *Mancilla*, *supra*, 67 Cal.App.5th at p. 863 ["the prosecution has the burden of proving beyond a reasonable doubt that the petitioner is ineligible for resentencing"].)  Jose contends that, rather than requiring the People to prove beyond a reasonable doubt he intended to kill and therefore was guilty of aiding and abetting the murder, the superior court found only that the People's theory was a "'more reasonable interpretation' of the evidence" than Jose's.  In the alternative, Jose contends the court applied an appellate standard of review, "reviewing the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence."

In support of his contentions, Jose points to a discussion during the evidentiary hearing about the evidence that Jose yelled "get the heat" and that Jonathan then ran to the car.  The superior court stated it was "certainly one interpretation of the evidence that, at the time, Jonathan decided to escape and wanted nothing more to do with [the fight], but the other more reasonable interpretation—the interpretation that's consistent with all the other evidence here, is that he went to go get a gun."  Choosing a "more reasonable interpretation" of the evidence, Jose argues, is not making a finding beyond a reasonable doubt, which requires the trier of fact to "feel an abiding conviction of the truth

the context of reviewing a trial judge's ruling after a full hearing under section 1170.95 subdivision (d)(3)"].)

10

of the charge" (§ 1096) and to be "'reasonably persuaded to a near certainty'" (*People v. Thompson* (1980) 27 Cal.3d 303, 324; see *In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1372).

Considered in isolation, the court's observation that one interpretation of circumstantial evidence was "more reasonable" than another (rather than the only reasonable interpretation) might suggest the court was applying a standard of proof less exacting than beyond a reasonable doubt. (See *People v. Canizales* (2019) 7 Cal.5th 591, 606-607; *People v. Lenix* (2008) 44 Cal.4th 602, 627; see also CALCRIM No. 225 ["before you may rely on circumstantial evidence to conclude that the defendant had the required [intent], you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required [intent]"].) Earlier in the hearing, however, the court recognized it had to adopt Jose's interpretation of the evidence (i.e., Jonathan ran to the car to escape, not to get a gun) if the court found Jose's interpretation was reasonable. Responding to counsel for Jose's argument, the court stated, "That is one version of the events that presumably the defense argued at trial, but was rejected. . . . It's not the only interpretation, and . . . if it's a reasonable interpretation, the court must adopt it."

Jose also cites the superior court's statement: "This court is aware of the difference between the standard of proof at trial and the standard of proof on appeal, and it considers the totality of the circumstances here." Jose argues the court's reference to the "totality of the circumstances" suggests the court "looked at the totality of the evidence and determined what was a reasonable interpretation" rather than whether the evidence proved Jose was guilty beyond a reasonable doubt. The most

11

"reasonable interpretation" of the court's statements, however, is that the court understood and applied the correct standard of beyond a reasonable doubt, correctly believed the court should consider all the facts and circumstances in determining whether the People had met that burden, and independently found the People proved the elements of aiding and abetting murder beyond a reasonable doubt.[3]

Moreover, the transcript of the hearing, considered in its entirety, shows that the superior court required the People to prove beyond a reasonable doubt Jose was guilty of murder under a still-valid theory. For example, at the beginning of the hearing the court stated the People had to prove "each and every element of murder under the law as it currently exists." At the conclusion of the hearing, the court found that the People had met their burden of proving "each and every element" beyond a reasonable doubt and that Jose could still be convicted of murder under current law. These statements remove any doubt about whether the court used the proper standard of proof.

---

[3] Jose also contends the court cited evidence that was not in the record, for example, that the fight was planned and that Jonathan asked one of the victims "where he's from," indicating a gang-related confrontation, rather than the more innocuous "where's the party." In both instances counsel for Jose pointed out the court's mistake, and the court accepted the correction. There is no indication the court relied on a mistaken recollection of the evidence.

C.     *Substantial Evidence Supported the Superior Court's Finding Beyond a Reasonable Doubt Jose Was Ineligible for Relief Under Section 1170.95*

As discussed, Senate Bill No. 1437 eliminated the natural and probable consequences doctrine for murder.  But it left intact the direct aiding and abetting theory of murder, which the superior court found the People proved at the evidentiary hearing under section 1170.95, subdivision (d), beyond a reasonable doubt.  Jose contends substantial evidence did not support that finding because his "actions did not support a finding that he harbored the requisite intent to kill."

A "'person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.'" (*People v. Gonzales* (2011) 52 Cal.4th 254, 295-296; see *People v. Abelino* (2021) 62 Cal.App.5th 563, 578.)  Under "direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.'" (*Gentile*, *supra*, 10 Cal.5th 830 at p. 843.)  "A direct aider and abettor's 'guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state.'" (*People v. Pacheco* (2022) 76 Cal.App.5th 118, 124.)  An "'aider and abettor's mental state must be at least that required of the direct perpetrator,' and when the crime is murder, the 'aider and abettor must know and share the murderous intent of the actual perpetrator.'" (*People v.*

13

*Maciel* (2013) 57 Cal.4th 482, 518; see *People v. Offley* (2020) 48 Cal.App.5th 588, 596.) A "direct aider and abettor to murder must possess malice aforethought." (*Gentile*, at p. 848.) "'Among the factors which may be considered in determining aiding and abetting are: presence at the crime scene, companionship, and conduct before and after the offense.'" (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1065.)

Jose contends substantial evidence did not support the court's finding he intended to kill. Jose asserts there was no evidence he knew Jonathan had a knife, saw Jonathan stab anyone, or intended that Jonathan kill anyone. Jose asserts that the evidence showed he planned to drop off his brother at the party, but that at the scene decided to get out of the car, reveal his gang tattoos, and shout his gang name to protect his brother, who was outnumbered in a fight with larger men. He further asserts there was no gun at the scene. He points to the evidence that, when he and Jonathan got out of the car, neither of them had a gun and that, when they got back to the car and were under attack, neither of them reached for a gun.

Substantial evidence, however, supported the superior court's finding Jose aided and abetted the murder of Pasqual. Despite Jose's assertion he did not see the knife, there was evidence he did. Jose was not far from Jonathan when Jonathan started the fight, which Jose said he watched as he sat in his car. When Jonathan approached the teenagers, they were standing around Pasqual's car, and Sedano was talking with Pasqual, who was in the driver's seat. Jose testified he parked "right

14

behind" Pasqual's car, "maybe five steps away."[4]  Jonathan got out of the car, began fighting with Sedano, and stabbed him in the stomach.  Jose testified that, from his seat in the car, he saw Jonathan fighting "one-on-one" before a second person joined the fight.  From Jose's testimony, the court could reasonably infer Jose knew Jonathan had a knife and saw him use it to stab Sedano.

In addition, the evidence showed Jonathan openly wielded the knife, which as stated had a five- to six-inch blade, which undermined Jose's assertion he did not see a knife.  Sedano testified Jonathan "kept swinging it and swinging it, and I just kept on jumping back so he won't get me with the knife."  Hernandez testified that, after Jonathan stabbed Sedano, Jonathan walked with the knife in his hand toward Hernandez, and when Hernandez backed away, Jonathan turned around and approached some of the other teenagers, "moving the knife around, trying to see pretty much who to hit again."  And when Jose was in the driver's seat of the car at the end of the fight and trying to drive away, Jonathan stabbed Hernandez in the arm and tried to stab Cabrera when Cabrera reached into Jose's side of the car to prevent the two brothers from leaving.

From this evidence the court could reasonably infer Jose knew Jonathan had a knife, knew he would use it, and saw him using it.  In addition, Jose escalated the level of violence by showing his gang tattoos, calling out his gang name, and shouting to Jonathan to get a gun.  The court could also reasonably infer that there was a gun in the car and that the

---

[4]  Other witnesses confirmed Jose's car was close to Pasqual's car.  For example, Hernandez testified Jose's car stopped "like a few feet from us . . . in the middle of the street."

reason Jonathan did not use it was that the teenagers prevented the brothers from reaching it. And Jose further aided Jonathan by creating a distraction; by starting a fight with Gutierrez and Hernandez, Jose drew them away from Jonathan, enabling Jonathan to stab Cabrera and Pasqual. Finally, several of the teenagers testified that while fleeing Jose drove the car at them and at Pasqual, who was on the ground, and that they had to move Pasqual out of the way so that Jose would not hit him, testimony that confirmed Jose had an intent to kill. (See *People v. Sedillo, supra,* 235 Cal.App.4th at p. 1066 [substantial evidence supported the defendant's conviction for aiding and abetting a murder where the defendant drove the shooter to the scene of the shooting, waited while the shooting took place, and drove the shooter away after the shooting]; *People v. McDaniels* (1980) 107 Cal.App.3d 898, 904 [substantial evidence supported the defendant's conviction for aiding and abetting a murder where the defendant was present during pre-shooting discussions, was among those who cornered the victim prior to the shooting, and left the scene with others after the shooting]; see also *People v. Burgos* (2022) 77 Cal.App.5th 550, 560 [substantial evidence supported the defendant's conviction for aiding and abetting a robbery where the defendant "was a 'continuous constituent' of the group that committed the robbery—before, during, and after the offense"].)

Jose also argues that the superior court, in finding Jose aided and abetted Pasqual's murder, erred by citing "this Court's findings in its original opinion that there was sufficient evidence to support a first-degree murder conviction" because the "conclusions in that opinion were based on law that is no longer valid." Jose argues that in our 2011 opinion we concluded that

16

his "case required a remand for retrial given a constitutionally deficit jury instruction on the elements of the murder charge" and that, after the Supreme Court's decision in *Chiu*, he "could no longer be liable for first-degree murder under a natural and probable consequence theory." At the evidentiary hearing, after stating the evidence Jose told Jonathan to get a gun and tried to run over several people as he drove away supported an inference Jose intended to kill, the court noted we had cited that evidence in our 2011 opinion: "In fact, the Court of Appeal found that it was sufficient evidence to support willful, deliberate, and premeditated murder on the behalf—on the part of Jose."[5]

Jose has not identified any statement by the superior court suggesting it relied on a legal theory that is no longer valid. The court described the evidence of Jose's participation in the crime and commented that we concluded in our 2011 opinion that substantial evidence supported Jose's conviction for aiding and abetting the murder. When the prosecutor referred to our 2011 opinion and said, "I'd like to start off with the appellate court decision and the appellate court actually finding that Mr. Jose— that there was sufficient evidence to find Mr. Jose Avila guilty of first degree murder," the superior court responded, "But it's not the standard that we have today."[6]

---

[5] In our 2011 opinion we stated that "substantial evidence supports Jose's conviction for first degree murder as an aider and abettor" and that we were not considering "whether there was substantial evidence under the natural and probable consequence doctrine." (*People v. Avila* (Feb. 8, 2011, B219748) [nonpub. opn.], at p. 10.)

[6] Jose does not argue in his opening brief the superior court erred by reviewing the facts in our 2011 opinion. In any event,

## DISPOSITION

The superior court's order denying Jose's petition under section 1170.95 is affirmed.



SEGAL, Acting P. J.



We concur:



FEUER, J.



WISE, J.*

---

there is no indication the superior court relied on the factual summary in our prior opinion, rather than the trial transcript, in finding Jose was ineligible for relief under section 1170.95. (Cf. *Clements*, *supra*, 75 Cal.App.5th at p. 292 [as amended effective January 1, 2022, section 1170.95, subdivision (d)(3), allows a trial judge to rely on the procedural history, but not the factual summary in a prior appellate decision].)

\* Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.